**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MINNIE MITCHELL-MATTHEWS,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>Defendants. | Case No.  13-cv-02854-BLF<br><br>**ORDER**<br>**(1) GRANTING DEFENDANTS'**<br>**MOTION FOR SUMMARY**<br>**JUDGMENT; AND**<br>**(2) DENYING PLAINTIFF'S MOTION**<br>**FOR PARTIAL SUMMARY**<br>**JUDGMENT**<br><br>[Re:  ECF 45, 56] |

In this employment suit, Plaintiff, an employee of the California Department of Rehabilitation ("DOR"), claims that her supervisor retaliated against her for engaging in conduct protected by the First Amendment. During a meeting with an angry DOR consumer, A.F., Plaintiff silently motioned to another DOR employee to call the California Highway Patrol ("CHP") because she felt that A.F. posed a threat to other DOR employees and her. Plaintiff's supervisor, Donna Hezel, determined that Plaintiff acted in violation of DOR policy, and placed a corrective memorandum, titled "Informal Corrective Interview Regarding Professional Conduct" (hereinafter "the Corrective Memorandum") in Plaintiff's file. Plaintiff brought suit against Ms. Hezel and the State of California.

Plaintiff alleges a Section 1983 claim against Ms. Hezel for retaliation in violation of her free speech rights. She further alleges two claims against the State: for retaliation under the Fair Employment and Housing Act ("FEHA"), and for medical condition discrimination in violation of Title VII and FEHA. Defendants seek summary judgment as to all claims, or, in the alternative, partial summary judgment on each of Plaintiff's claims. Plaintiff opposes, and filed a cross-motion for partial summary judgment as to her Section 1983 claim against Ms. Hezel. The Court has

considered the briefing and oral argument of the parties, as well as the governing law. For the reasons stated below, the Court GRANTS Defendants' motion for summary judgment in its entirety and DENIES Plaintiff's cross-motion for partial summary judgment.

## I.   BACKGROUND

### A.   Procedural History

Plaintiff filed suit on June 20, 2013, and filed the operative First Amended Complaint ("FAC") on April 22, 2014. Defendants answered on May 12, 2014. Defendants filed their motion for summary judgment on January 2, 2015, and Plaintiff filed an opposition and partial cross-motion on January 18, 2015. The parties appeared for oral argument on February 12, 2015.

### B.   Undisputed Facts

Plaintiff is an employee of the California Department of Rehabilitation, a state agency tasked with serving individuals with disabilities, including mental disabilities. At the time of suit, Plaintiff held the title of Senior Vocational Rehabilitation Counselor ("SVRC"), where she had a "supported employment" caseload which consisted of working with individuals who were diagnosed with intellectual disabilities. Plaintiff's job functions included, but were not limited to, counseling individual consumers to determine their eligibility for services, arranging rehabilitative services for consumers, and "providing services in compliance with the Department's Rules and Regulations." *See* Mitchell-Matthews Decl., ECF 60 Exh. 1 at 1 (Plaintiff's job description, describing her "essential job functions").

#### 1.   Plaintiff Causes CHP to be Called During a Meeting with A.F., an Angry DOR Consumer

The first incident which gives rise to this suit occurred on June 8, 2011. Plaintiff was asked to attend a meeting with one of DOR's consumers, A.F., and another counselor, Linda Labit. *See* Mitchell-Matthews Depo., Hamilton Decl. Exh. 1 at 50:6-51:1 ("I was informed by Donna [Hezel] and Linda [Labit] that I was going to sit in a meeting with A.F."). Plaintiff understood prior to the meeting that A.F. was angry, and learned when the meeting began that A.F. was angry because his file had been closed by another DOR employee, which A.F. asserted caused a delay in his receipt of benefits. *See id.* at 50:16-54:19. Plaintiff, Ms. Labit, and A.F. met at DOR's offices. Plaintiff

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

described A.F. as extremely angry, irate, agitated, and loud, *see* Mitchell-Matthews Decl., ECF 60-2 Exh. 2 at 4 (Plaintiff's incident report filed June 9, 2011, hereinafter "Plaintiff's Incident Report"); *see also* Mitchell-Matthews Depo. at 55:12-22, and states that he engaged in verbally abusive escalating behaviors, including speaking "about holding a grudge and wanting to kill [his] family members but he can't now because they are too old." Mitchell-Matthews Decl. ¶ 10. Plaintiff saw A.F.'s behavior as a potential threat to DOR staff and herself. *Id.* at ¶ 14.

At some point during the meeting with A.F., Ms. Labit instructed Plaintiff to leave the room in order to retrieve a form A.F. needed to fill out in order for his file to be reopened. *See* Mitchell-Matthews Depo. at 56:11-14. Ms. Labit remained in the room with A.F., alone, and states in an uncontroverted declaration that she did not feel threatened by A.F., nor did she perceive A.F. to be a threat to any other DOR employees, including Plaintiff. *See* Labit Decl., ECF 48 ¶ 6. While Plaintiff was out of the room, she spoke with another DOR employee, Dolora Gualberto, who was working at the front desk. *See* Mitchell-Matthews Decl. ¶ 11. Ms. Gualberto said that she could hear A.F. yelling through the door, and Plaintiff stated that she "might need [Ms. Gualberto] to call the CHP for back up if A.F. did not calm down." *Id.* Plaintiff declares that she was gone from the room "briefly," *id.*, and Ms. Labit's Incident Report states that Plaintiff was gone for approximately ten minutes. *See* Labit Incident Report, ECF 59-3 at 20. After Plaintiff returned to the room where A.F. and Ms. Labit were meeting, A.F.'s behavior continued to escalate, and Plaintiff "motioned to Ms. Gualberto [to] call the CHP" because she believed that A.F. posed a potential threat to Ms. Labit, staff, and herself. *Id.* at ¶ 14. After CHP arrived, A.F.'s behavior deescalated and he left the DOR office.

In Plaintiff's Incident Report, written the following day, she states that she was "not afraid of A.F.," but "for safety reasons believe[d] it was best to call for back up." Pl.'s Incident Report, ECF 60-2 at 4; *see also* ECF 59-1 at 29 (a July 5, 2011 letter written by Plaintiff in which she states "I was not afraid of the consumer."). In later deposition testimony, Plaintiff stated that she felt personally threatened by A.F., and believed that A.F. posed a threat to other office personnel. Mitchell-Matthews Depo. at 108:5-17.

United States District Court
Northern District of California

**2.      Ms. Hezel's Response to Plaintiff Following the Incident**

On June 9, Defendant Hezel, who was Plaintiff's supervisor, met with Ms. Labit and Plaintiff regarding the incident. *See* Mitchell-Matthews Decl. ¶ 16. After this meeting, Ms. Hezel spoke with Deborah Sweeney, the DOR District Administrator, regarding the incident. Ms. Hezel was concerned that Plaintiff had caused CHP to be called without first discussing it with Ms. Labit, who was also present at the meeting and had even been alone with the consumer. *See* Hezel Decl. ¶ 9. At Ms. Sweeney's instruction, Ms. Hezel spoke with Loreli Scozzari, the DOR's personnel analyst, because the incident concerned the proper application of one of DOR's policies. *See id.* It was determined that the appropriate response to Plaintiff would be an informal corrective memorandum. *Id.* at ¶ 11. Ms. Hezel gave Plaintiff the Corrective Memorandum on June 30, 2011, which includes "a summary of what was discussed when we met . . . on June 9." Mitchell-Matthews Depo. Exh. A, ECF 50-2 at 2. The Corrective Memorandum states that "[w]e discussed appropriate protocol to follow in the future should this type of incident arise again," and expressed Ms. Hezel's opinion that Plaintiff "could have sought out another supervisor in the office to have them intervene and determine if the CHP should be contacted." *Id.* The Corrective Memorandum continued, "[p]lease know that CHP should not be contacted without guidance from a supervisor," and in response to Plaintiff's indication that more training would be useful, Ms. Hezel advised her that DOR would schedule further training regarding when CHP should be contacted. *Id.* at 3. The Corrective Memorandum also noted that "Linda Labit did not feel threatened when interacting with the client." *Id.* at 2. The Corrective Memorandum was not placed in Plaintiff's personnel file, *see* Scozzari Decl. ¶ 3 ("Exhibit A [the Corrective Memorandum] was never placed in Ms. Mitchell-Matthews' Official Personnel File."), though Ms. Hezel did place the Corrective Memorandum in Plaintiff's "drop file," which is an employee file kept by a supervisor and which can be passed between supervisors. Hezel Decl. ¶ 15; *see also* Hezel Depo. 160:18-161:15.

**3.      The DOR's Policies Regarding Contacting CHP**

Plaintiff testified in her deposition that she contacted CHP based on her understanding of appropriate DOR policy. *See* Mitchell-Matthews Depo. at 119:1-9 (Mr. Hamilton: "By asking Dolly to call the CHP, you believed that you were complying with the policies and procedures as

your understood them to be?" Plaintiff: "Yes."); *see also id.* at 228:18-229:14. It is undisputed that DOR has two policies that implicate when an employee may contact CHP in response to harassing or threatening behavior – though the parties dispute which policy applied to Plaintiff's conduct.

The DOR has promulgated a policy entitled "Guidelines for Addressing Threatening or Harassing Behavior by Applicants/Consumers" (hereinafter "Threatening Behavior Policy"). *See* Hezel Decl. Exh. A, ECF 47 at 27-30. This policy outlines what actions DOR employees can and should take when faced with a consumer who is engaged in threatening or harassing behavior, and is designed to "provide DOR staff with a consistent procedure for documenting and reporting threats and potential threats." *Id.* at 27. It states that the "DOR should seek assistance from law enforcement [] when an applicant or consumer commits or threatens to commit a crime . . . against DOR personnel." *Id.* But the Threatening Behavior Policy further instructs DOR employees to "take into consideration the disability of the applicant/consumer when assessing a behavior to determine if or whether it is threatening or harassing," because a "disabling condition or medication problem could result in a behavior appearing to be but that is not threatening or harassing." *Id.* This policy outlines specific circumstances in which an employee may contact law enforcement:

> Any emergency situation that involves a credible threat of <u>imminent</u> serious violence or physical harm that would cause a reasonable person to fear for his/her safety should be reported to local law enforcement . . . . Any employee [who] feels that he/she is at risk of harm may dial 9-1-1 with or without their supervisor's approval. If an employee does not consider himself/herself to be in immediate danger, he/she should notify his/her supervisory for the supervisor to determine the appropriate action.

*Id.* at 28. When DOR employees "observe or experience threatening or harassing behavior," they are to "report it immediately to their direct supervisor." *Id.* at 29.

In addition to the Threatening Behavior Policy, which is specific to threatening and harassing behavior by consumers, the DOR also has a general Workplace Violence Policy, the objective of which is to "promote a safe, healthy, secure, and productive work environment" that is "free from threats and acts of violence to protect the health and safety of all employees." Bonner Decl., ECF 59-1 at 37-51.The Workplace Violence Policy states that "[b]ehavior of a threatening

manner, harassment, intimidation, committing an act that results in bodily injury, or damage/destruction of property is prohibited." *Id.* at 39. The Workplace Violence Policy further instructs DOR employees that they may "[c]all 9-1-1 if there is an emergency situation necessitating immediate law enforcement intervention or if someone has been injured." *Id.* at 46. This Workplace Violence Policy also states that employees should "[r]eport all threats or acts of workplace violence to the supervisor or manager immediately," *id.*, outlines the responsibilities of employees when faced with violence in the workplace, and describes the discipline employees can face if they engage in conduct prohibited under the policy. *See id.* at 45.

### 4.   Plaintiff's Testimony That She Acted in Conformance with Her Understanding of DOR Policy

In her deposition, Plaintiff testified that when she motioned to Ms. Gualberto to call CHP, she believed she was acting in conformance with DOR policy. *See* Mitchell-Matthews Depo. at 229:6-14; *see also id.* at 109:1-4 (Mr. Hamilton: "And in your mind also did you believe that you were [acting] in conformity and pursuant to what you believed the policy was?" Plaintiff: "Yes."). She states that prior to the June 8, 2011 incident, she was trained on when it was appropriate to contact CHP, *id.* at 228:18-22, and had been informed of DOR's policies regarding when an employee could contact CHP. *See id.* at 229:3-10. Based on her understanding of DOR policy and her training, Plaintiff believed that she had the authority to ask Ms. Gualberto to contact CHP. *Id.* at 229:11-14.

### 5.   The Alleged Retaliation Against Plaintiff Following the June 8 Incident

Prior to the June 8 incident, Plaintiff received high marks in her yearly employment evaluations. For the two evaluation periods prior to the incident, Ms. Hezel gave Plaintiff a rating of "exceeds expectations" – the highest mark that could be given – in six of seven evaluation categories. She was rated "meets expectations" in the remaining seventh category. Bonner Decl., ECF 59-1 at 85 (Plaintiff's September 8, 2010 Individual Development Plan). In the evaluation received after the June 8 incident, however, Ms. Hezel gave Plaintiff a rating of only "meets expectations" in five of seven categories. *Id.* at 88. The narrative portion of the evaluation was also changed, including the removal of the sentence "It is a pleasure working with you" from the

evaluation. *Id.* at 92. Plaintiff states that Ms. Hezel's actions following the write-up left her feeling embarrassed and depressed, and made her fear for her future employment, because the Corrective Memorandum would be available for others to review if she were to apply for a promotion or transfer. *See* Mitchell-Matthews Decl. ¶ 18.

In addition to these performance evaluations following the corrective memorandum, Plaintiff outlines a number of events which she contends were retaliation in response to her protected speech, including: (1) being denied National Association of Mental Illness ("NAMI") training, (2) being denied use of an official laptop computer when she worked at another DOR location, the San Andreas Regional Center ("SARC"), (3) being investigated for a "heated conversation" with a co-worker, (4) denial of a request for a reduction in hours, (5) removal of Plaintiff's orientation duties, (6) being unfairly accused of violating DOR's cell phone policy, (7) being required to perform officer-of-the-day duties despite being part-time, (8) Ms. Hezel accusing Plaintiff of being "confused" and otherwise criticizing her work performance, (9) denial of membership on DOR's diversity team, and (10) being twice denied her preferred note-taker for business meetings.

### 6. Plaintiff's Internal DOR Complaint and Alleged Retaliation Thereafter

On February 25, 2013, Plaintiff complained to Ms. Sweeney's supervisor, William Moore, that she was being harassed at work. *See* Bonner Decl., ECF 59-4 at 45 (email from Plaintiff to William Moore). Plaintiff was scheduled to meet with Ms. Hezel on March 19, 2013, and requested a note-taker be present for that meeting. Plaintiff has a "physical orthopedic condition" which results in chronic pain in her back and shoulder, Hamilton Decl. Exh. A at 369:11-370:5, and requested the note-taker, or in the alternative a tape recorder, as a reasonable accommodation during the meeting. *See* Bonner Decl., ECF 59-4 at 49 ("Due to my disability I had requested a note taker and/or to use a tape recorder during this meeting."). Defendants designated Ms. Labit as the note-taker for the meeting, which Plaintiff objected to because Ms. Labit was "management." *Id.* In an email to Plaintiff, Ms. Sweeney told Plaintiff she was being "insubordinate" in refusing to accept her supervisor's choice of employee to take notes. *Id.* at 52. Plaintiff contends that Ms. Sweeney's response was in retaliation for her internal email complaint to Mr. Moore.

United States District Court
Northern District of California

United States District Court
Northern District of California

**C.      Objections**[1]

Plaintiff objects to three portions of the Declaration of Donna Hezel: (1) paragraphs 10 and 11, where she discusses the Threatening Behavior policy, on the grounds that it conflicts with her deposition testimony; (2) the portion of paragraph 11 where Ms. Hezel states "I understand that Minnie would not have produced the same 4 page policy if she did not think that it was relevant to this litigation," for lack of foundation and speculation under Rule 603 and improper lay opinion under Rule 701; and (3) the portion of paragraph 46 where Ms. Hezel discusses the content of Plaintiff's union contract, both for lack of foundation under Rule 603 and as hearsay under Rule 802. *See* Pl.'s Cross-Motion at 25.

Having considered the objections, the Court SUSTAINS Plaintiff's second objection for lack of foundation. The Court OVERRULES her first objection, as "conflicting testimony" is not an objection contemplated under the Federal Rules of Evidence. The third objection is also OVERRULED because the testimony is offered to explain Hezel's conduct, not for the truth of the matter asserted.

**II.      LEGAL STANDARD**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). The Court draws all reasonable inferences in favor of the party against whom summary judgment is sought. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[1] After the hearing on the cross-motions, Plaintiff filed a "request for judicial notice" in which he submitted evidence in an attempt to clarify a disputed fact. ECF 65 at 1-2. Defendants objected on the grounds that the motions were submitted to the Court for decision upon completion of oral argument, and that it was improper for Plaintiff to "belatedly attempt to clarify an argument already made to the court . . . when no further clarification was requested by the Court." ECF 66 at 1-2. Defendants are correct – post-argument clarification is not appropriate through a request for judicial notice after counsel were both given ample opportunities to explain their arguments and cite to evidence on record at the hearing. The Court therefore STRIKES Plaintiff's post-hearing request for judicial notice, and does not consider the arguments contained therein.

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F.Supp.2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In order to meet its burden, the moving party must "either produce evidence negating an essential element of the nonmoving party's claim or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, "the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal.1995). A material fact is one that could affect the outcome of suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009). If the Court finds that a reasonable jury could find for the non-moving party, summary judgment is inappropriate. *See, e.g.*, *Anderson*, 477 U.S. 242, 248. Conclusory and speculative testimony, however, is insufficient to defeat summary judgment. *See, e.g.*, *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

The filing of cross-motions for summary judgment or partial summary judgment does not mean that the material facts are undisputed, and the denial of one motion does not necessarily require the granting of the other. *See, e.g.*, *Regents of Univ. of Calif. v. Micro Therapeutics, Inc.*, 507 F. Supp. 2d 1074, 1077–78 (N.D. Cal. 2007) (citing *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1147 (10th Cir. 2000). The motions are to be evaluated in accordance with the requisite burden of proof facing each party. *Id.* at 1078.

## III.   DISCUSSION

### A.      Claim One: Plaintiff's Section 1983 Claim (Against Defendant Hezel)

Claim One asserts a cause of action against Ms. Hezel for violation of Plaintiff's First

9

United States District Court
Northern District of California

1   Amendment right to freedom of speech. Plaintiff argues that Ms. Hezel acted in "violation of the

2   First Amendment . . . by retaliating against Plaintiff for participating in statutorily protected

3   activity and speech." FAC ¶ 29. In her cross-motion, Plaintiff identifies the speech in question as

4   "the silent instruction Mrs. Mitchell-Matthews gave to Dolora Gualberto to call the CHP" on June

5   8. *See* Pl.'s Cross-Motion at 13. Both parties move for summary judgment as to this claim.

6   Defendant asserts that Plaintiff did not engage in protected speech, and, even if she did, that Ms.

7   Hezel is entitled to qualified immunity for any actions she took against Plaintiff.  Plaintiff argues

8   in response that her speech was constitutionally protected, and that Ms. Hezel's actions violated a

9   clearly established constitutional right.

10          Section 1983 does not itself confer substantive rights onto individuals, but rather provides

11   a remedy when constitutionally protected rights have been violated. *See, e.g.*, *Oklahoma City v.*

12   *Tuttle*, 471 U.S. 808, 816 (1985). To succeed on a claim under Section 1983, a plaintiff must

13   demonstrate two things: (1) the violation of a right secured by the Constitution and (2) that the

14   constitutional deprivation in question was committed by a person acting under the color of state

15   law. *See, e.g.*, *West v. Atkins*, 478 U.S. 42, 48 (1988). To state a claim that one's employer

16   violated the First Amendment, a public employee must show: "(1) that he or she engaged in

17   protected speech, (2) that the employer took 'adverse employment action', and (3) that his or her

18   speech was a 'substantial or motivating' factor for the adverse employment action." *Coszalter v.*

19   *City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

20          The Supreme Court has made clear that "public employees do not surrender all their First

21   Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417

22   (2006).  The First Amendment protects the right of public employees "in certain circumstances, to

23   speak as a citizen addressing matters of public concern." *Id.* (citing *Pickering v. Bd. of Educ. of*

24   *Township High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968)). In *Pickering*, the Supreme Court

25   considered whether a school district could discipline a public school teacher who had written a

26   letter to a local newspaper regarding the school board's funding policies.  It found that there

27   needed to be a "balance between the interests of the teacher, as a citizen, in commenting upon

28   matters of public concern and the interest of the State, as an employer, in promoting the efficiency

1    of the public service it performs through its employees." *Pickering*, 391 U.S. 563, 568.

2        The Court identified in *Pickering* two questions courts must ask in order to determine

3    whether the speech of a public employee is protected under the First Amendment. First, a court

4    must decide whether the employee spoke as a citizen on a matter of public concern. *See id.*; *see*

5    *also Garcetti*, 548 U.S. at 418. "If the answer [to this first question] is no, the employee has no

6    First Amendment cause of action based on his or her employer's reaction to the speech." *Id.*

7    (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983)). If the Court determines, however, that the

8    answer to that first question is yes, it must then decide "whether the relevant governmental entity

9    had an adequate justification for treating the employee differently from any other member of the

10   general public." *Garcetti* at 418 (citing *Pickering* at 568). A government agency has "broader

11   discretion to restrict speech when it acts in its role as an employer, but the restrictions it imposes

12   must be directed at speech that has some potential to affect the entity's operations." *Id.*

13       The parties in this case spent ample briefing on *Pickering's* first question, whether Plaintiff

14   spoke on a matter of public concern. The Supreme Court in *Garcetti* grappled with this question,

15   finding that a calendar deputy in the Los Angeles County District Attorney's Office who

16   submitted a memorandum to his supervisors recommending a case be dismissed due to

17   misrepresentations contained in a search warrant did not speak as a citizen on a matter of public

18   concern because his "expressions were made pursuant to his duties as a calendar deputy." 547 U.S.

19   410, 421 ("Restricting speech that owes its existence to a public employee's professional

20   responsibilities does not infringe any liberties the employee might have enjoyed as a private

21   citizen.").  This case presents a close call as to *Pickering's* first question when all inferences are

22   drawn in Plaintiff's favor. For the purposes of this Order the Court will assume without deciding

23   that Plaintiff's speech – her silent motioning to Ms. Gualberto to call CHP in response to A.F.'s

24   behavior – was made as a citizen on a matter of public concern.[2] This is because the Court

25   _____

26   [2] At least one recent out-of-district case not cited by either party, *Goff v. Kutztown University*,
     confronted a similar situation as the Court is faced with here and found that the speech in question
27   was not on a matter of public concern. In *Goff*, a university police officer, upon receiving two
     phone calls from the wife of a fellow officer, called the State Police because he believed her to be
28   in imminent danger of deadly harm at the hands of her husband. He was ultimately terminated, and
     brought suit, alleging that his termination was in retaliation for this call. *Goff*, 2014 WL 5390477

United States District Court
Northern District of California

determines, under *Pickering's* second question, that the DOR had adequate justification for treating Plaintiff differently from a member of the general public in responding to her speech with the Corrective Memorandum.

> **1.**    **Even if Plaintiff's Speech was on a Matter of Public Concern, DOR has**
> **Adequate Justification for Limiting when its Employees can Contact CHP**

If speech is made by a citizen on a matter of public concern, the Court must determine "whether the relevant governmental entity had an adequate justification for treating the employee differently from any other member of the general public." *Pickering* at 568. It is clear to the Court that because of the context of the DOR's mission, and its statutory obligation to serve a vulnerable population, it must be able to limit the type of speech in which Plaintiff engaged during the A.F. incident. *See Walters v. Churchill*, 511 U.S. 661, 672 (1994) (describing "the practical realities of government employment, and the many situations in which, we believe, most observers would agree that the government must be able to restrict its employees' speech").

The DOR is tasked with dealing with an at-risk population of California residents – individuals with disabilities, including mental disabilities. Ms. Hezel describes DOR's mission as "to provide service to, and act as an advocate for, California residents with physical and mental disabilities, the goal of which is to find employment for such individuals because they are not always treated equally." Hezel Decl. ¶ 4; *see also* Labit Decl. ¶ 3. Ms. Labit goes on to describe the individuals who seek out services from DOR, stating:

> A large number of DOR's consumers have a mental illness disability; and a few even have a criminal history, which may include incarceration, either in a jail or prison. . . . Because having a disability, combined with a criminal history, acts as a barrier to employment, DOR's services are uniquely suitable for such individuals. Disabled California residents are eligible for DOR's services, and are not disqualified from seeking DOR's services, simply because they have been arrested and/or convicted of a crime, or have been previously incarcerated.

---

(E.D. Pa. Oct. 22, 2014). The Court, at the motion to dismiss stage, determined that the call was made as a private citizen and not as a public employee, in part because Plaintiff was in a romantic relationship with the woman. The Court further rejected Plaintiff's argument that, because the call was made in response to domestic violence, it was on a matter of public concern. The Court declines to adopt *Goff's* reasoning and extend its holding to the factual circumstances of this case.

United States District Court
Northern District of California

*Id.* at ¶ 4. Plaintiff describes A.F. as being eligible for services as a DOR consumer because he had a mental health disability. *See* Mitchell-Matthews Depo. 45:9-16.

Recognizing the sometimes volatile nature of its clientele, and its mission to serve those individuals, DOR has developed specialized policies and training to protect worker safety and maximize services to its clients. These policies include the Threatening Behavior Policy, which specifically addresses what DOR employees should do when dealing with a threatening or harassing consumer. DOR trains its employees on these policies and their proper application, and prior to the June 8, 2011 incident with A.F. Plaintiff received training as to DOR's policies regarding when to call CHP *See, e.g.*, Mitchell-Matthews Depo. 228:18-21 (Mr. Hamilton: "But before that meeting on June 8th, 2011, you had some kind of training where you understood when it was appropriate to call the CHP; is that correct?" Plaintiff: "That's correct."). Plaintiff believed she was acting in conformance with DOR's policies at the time she called CHP, and continued to express in later testimony her opinion that she acted pursuant to her understanding of those policies. *See, e.g.*, *id.* at 228:18-229:14. Ms. Hezel, as Plaintiff's supervisor, disagreed, and issued the Corrective Memorandum in order to instruct Plaintiff on proper compliance with those policies. *See* Corrective Memorandum, ECF 49 at 5-6.

"When someone is paid a salary so that she will contribute to the agency's effective operation, the government employer must have some power to restrain her." *Walters* at 675. The Court concludes that DOR is entitled to adopt rules for its employees regulating when and how to contact law enforcement, and supervisors are entitled to correct employees when they act in a manner inconsistent with those rules. Even though Plaintiff felt that A.F. posed a threat, proper application of DOR's Threatening Behavior Policy provided ample guidance to employees to distinguish emergencies from disruptions, and to decide when to call CHP or, instead, seek guidance from a supervisor to determine an appropriate response. *Compare* Threatening Behavior Policy, ECF 47 at 28 ("An emergency situation that involves a credible threat of imminent serious violence or physical harm that would case a reasonable person to fear for his/her safety should be reported to local law enforcement by dialing the 9-911 emergency number or 911."), *with id.* ("If an employee does not consider himself/herself to be in immediate danger, he/she should notify

13

United States District Court
Northern District of California

1 his/her supervisor for the supervisor to determine the appropriate action.").[3] The plain language of

2 the Threatening Behavior Policy clearly contemplates that certain circumstances merit an

3 employee calling law enforcement while others do not, and it includes within it a reasonable

4 person standard. *See id.* The DOR had ample justification for promulgating this policy and holding

5 its employees to its terms – as an organization that deals with individuals with disabilities who

6 could act in conformance with their disabilities and be disruptive or pose a risk of harm to

7 employees or the public, DOR must be able to set some boundaries as to how its employees

8 respond to those consumers. *See, e.g.*, *Walters* at 672 ("[W]hen an employee counsels her co-

9 workers to do their job in a way with which the public employer disagrees, her managers may tell

10 her to stop."). Plaintiff was trained on these boundaries, and when she called the CHP believed she

11 was acting in conformance with them. Plaintiff's supervisor disagreed. The DOR cannot be

12 prevented from correcting employee behaviors that do not conform to its duly-enacted policies.

13 *See Garcetti* at 421 ("[W]hen public employees make statements pursuant to their official duties,

14 the employees are not speaking as citizens for First Amendment purposes, and the Constitution

15 does not insulate their communications from employer discipline.").[4]

16    The DOR had adequate justification for treating Plaintiff differently from a member of the

17 general public. Plaintiff's speech therefore fails the second prong of the *Pickering* test. Because

18 Plaintiff cannot, therefore, show the first element of a claim for freedom of speech – that she

19 "engaged in protected speech" – her Section 1983 claim is fatally deficient. *See Coszalter*, 320

20 F.3d 968, 973 (9th Cir. 2003).

21            **2.    Ms. Hezel is Entitled to Qualified Immunity**

22    Although the Court need not determine whether Ms. Hezel is entitled to qualified

23 immunity because of its determination that Plaintiff did not engage in protected speech, *see, e.g.*,

24 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Court nonetheless further finds, for the

25 _____

26 [3] Nothing in the DOR policy prevented Plaintiff, after she left the interview room where Ms. Labit remained with A.F., from seeking a supervisor's advice as to what the appropriate response should
27 have been, instead of speaking to Ms. Gualberto at the front desk.

28 [4] Here, it is undisputed that the Corrective Memorandum was not disciplinary in nature and was not placed in Plaintiff's Official Personnel File. *See* Scozzari Decl. ¶¶ 2-5.

United States District Court
Northern District of California

1   reasons below, that Ms. Hezel is entitled to qualified immunity for any of her actions taken in

2   response to Plaintiff's conduct, and that qualified immunity serves as a second independent reason

3   to grant summary judgment in favor of Ms. Hezel.

4          A government official sued under Section 1983 is entitled to qualified immunity for their

5   conduct unless the Plaintiff shows that (1) the official violated a statutory or constitutional right,

6   and (2) the right was "clearly established" at the time of the challenged conduct. *See, e.g.*,

7   *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Until recently, courts were required to

8   determine qualified immunity by considering these two steps in a particular order: first, the court

9   needed to determine whether the Plaintiff had demonstrated a violation of a constitutional right,

10  and then, if the first step was satisfied, the court needed to decide whether the right at issue was

11  "clearly established" at the time of the defendant's alleged misconduct. *See Saucier v. Katz*, 533

12  U.S. 194, 201 (2001). In 2009, the Supreme Court retreated from this command in *Pearson v.*

13  *Callahan*, holding that courts could grant qualified immunity on the ground that the purported

14  right was not clearly established by prior case law, without first considering whether the right

15  existed at all. *See* 555 U.S. 223, 236 (2009); *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).

16         To be clearly established, a right must be sufficiently clear such that "every reasonable

17  official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131

18  S. Ct. 2074, 2078 (2011). The Supreme Court has held that this means "existing precedent must

19  have placed the statutory or constitutional question beyond debate." *Id.* at 2083. When

20  determining whether a right was clearly established, the Court may not define the constitutional

21  right at a high level of generality, because doing so "avoids the crucial question whether the

22  official acted reasonably in the particular circumstances that he or she faced." *Plumhoff* at 2023.

23  "The relevant inquiry is whether, at the time of the officers' action, the state of the law gave the

24  officers fair warning that their conduct was unconstitutional." *Ford v. City of Yakima*, 706 F.3d

25  1188, 1195 (9th Cir. 2013). Here, the clearly established prong cannot be met, because neither the

26  Supreme Court nor the Ninth Circuit had, as of June 8, 2011, recognized a First Amendment right

27  for a public employee to be free from corrective action from a supervisor when that supervisor

28  believed the employee acted in contravention of a duly promulgated agency policy outlining when

1    it was appropriate to contact law enforcement.[5]

2    Upon learning that Plaintiff had contacted CHP in response to A.F., and having determined

3    (alongside Ms. Sweeney and Ms. Scozzari) that Plaintiff's actions violated DOR policy, Ms. Hezel

4    issued a corrective memorandum outlining how Plaintiff should respond to such a circumstance

5    "should this type of incident arise again." Hezel Decl. Exh. A at 1-2. Prior to June 8, 2011, the

6    Supreme Court had clearly stated that a public employer had the right to correct employee

7    behaviors when those behaviors ran counter to an agency's policy. *See Moran* at 850 ("When

8    someone who is paid a salary so that she will contribute to an agency's effective operation begins

9    to do or say things that detract from the agency's effective operation, the government employer

10   must have some power to restrain her."); *see also Walters* at 672 ("[W]hen an employee counsels

11   her co-workers to do their job in a way with which the public employer disagrees, *her managers*

12   *may tell her to stop*.") (emphasis added). In this circuit, Ms. Hezel is protected by qualified

13   immunity even if the policies under which she corrected Plaintiff's behavior were ultimately found

14   to be unconstitutional infringements of Plaintiff's free speech rights. *See, e.g.*, *Grossman v. City of*

15   *Portland*, 33 F.3d 1200, 1209-10 (9th Cir. 1994) (holding that officers who arrested an individual

16   pursuant to a duly-enacted city ordinance were entitled to qualified immunity, so long as the

17   ordinance is not "patently violative of fundamental constitutional rights"); *see also Chew v. Gates*,

18   27 F.3d 1432 (9th Cir. 1994) (finding that officers who implemented long-established policy were

19   entitled to qualified immunity when no existing case law demonstrated that such a policy was

20   unconstitutional at the time the officers acted).

21   This is a straightforward instance of an employee and a supervisor disagreeing as to

22   whether the employee acted in conformance with an agency's policies – policies about which the

23   employee was aware and on which she had received training. Ms. Hezel's Corrective

24   Memorandum states that Plaintiff acted inconsistently with DOR policy when she instructed Ms.

25   Gualberto to contact CHP. Plaintiff's insistence that the Corrective Memorandum stated that she

26

27   [5] Plaintiff identifies the right in question differently, contending that individuals have a "right to call police when faced with a threat." *See* Pl.'s Opp. at 23. *Plumhoff*, however, demands that the right be more clearly defined than this, so that the Court can determine whether "the official acted reasonably in the particular circumstances" she faced. *Plumhoff* at 2023.

28

1    could *never* call CHP without being subject to discipline is unsupported by the plain language of

2    the memorandum and the evidence before the Court: though the Memorandum says that "the CHP

3    should not be contacted without guidance from a supervisor," this sentence is included in a

4    paragraph that expressly outlines the "appropriate protocol to follow in the future *should this type*

5    *of incident arise again.*" Hezel. Decl. Exh. A at 1-2 (emphasis added).

6         The Court finds that it was not clearly established, at the time Ms. Hezel acted, that it was

7    unlawful for a supervisor to take corrective action when the supervisor determined that the

8    employee misapplied existing agency policy, even if the employee's speech implicated public

9    safety concerns. *See, e.g.*, *Garcetti*, 547 U.S. 410, 421.

10        Plaintiff's First Amendment claim thus fails for two reasons. First, the DOR has adequate

11   justification for treating her differently than other members of the public in limiting when CHP

12   can be contacted by employees. Second, Ms. Hezel's actions did not violate a clearly established

13   constitutional right, thus entitling her to qualified immunity. The Court therefore GRANTS

14   Defendant's motion for summary judgment as to Claim One, and DENIES Plaintiff's Cross-

15   Motion.

16        **B.      Claim Two: FEHA Retaliation (Against Defendant State of California)**

17        Defendant State of California seeks summary judgment as to Claim Two, for retaliation

18   under FEHA. Plaintiff's FAC alleges that the State of California violated FEHA by subjecting her

19   to adverse employment actions following her participation in "statutorily protected activities."

20   FAC ¶¶ 35-39. To establish a prima facie case under FEHA, Plaintiff must show three things: (1)

21   that she engaged in protected activity, (2) that her employer subjected her to adverse employment

22   actions, and (3) that there is a causal link between the protected activity and the employer's

23   actions. *See, e.g.*, *Morgan v. Regents of Univ. of Calif.*, 88 Cal. App. 4th 52, 69 (2000).

24        In its motion, Defendant challenges Plaintiff's prima facie case with regard to the EEOC

25   Complaint Plaintiff filed on June 18, 2013. *See* Def.'s Mot. at 23. In support of its argument,

26   Defendant cites to Plaintiff's deposition testimony, in which she stated that she was unsure

27   whether she had suffered retaliation as a result of filing that EEOC Complaint, *see* Mitchell-

28   Matthews Depo. at 355:7-356:17 (Mr. Hamilton: "[D]id you suffer some kind of retaliation

1    because you filed a claim with the EEOC." Plaintiff: "I may have." Mr. Hamilton: "You don't

2    know for sure?" Plaintiff: "No."). Defendant argues that this testimony shows that Plaintiff cannot

3    meet her burden to demonstrate that she was subjected to an adverse employment action – under

4    the second prong of FEHA's prima facie case – because she did not state the adverse action to

5    which she was subjected. Defendant also argues that Plaintiff cannot show a causal link between

6    the EEOC Complaint and any adverse action based on mere speculation that she "may have"

7    suffered retaliation. *See* Def.'s Mot. at 23 (citing *Morgan* at 69-70); *see also Soremekum*, 509 F.3d

8    978, 984 (9th Cir. 2007) (holding that speculative testimony is insufficient to defeat summary

9    judgment).

10          The burden thus shifts to Plaintiff to establish that there is a triable issue of material fact

11   such that a reasonable jury could find for the Plaintiff. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*,

12   477 U.S. 242, 248 (1986). In opposition, however, Plaintiff does not produce any evidence or

13   otherwise substantively respond to Defendant's argument, instead claiming that "there is a triable

14   issue of material fact" as to whether Plaintiff was subjected to retaliation based on a wholly

15   different complaint: her February 25, 2013 internal DOR email to William Moore, Ms. Sweeney's

16   supervisor. *See* Pl.'s Opp. at 23. This February 25 email is the only "statutorily protected activity"

17   that Plaintiff alleges in her opposition regarding her FEHA claim. Plaintiff's failure to produce any

18   specific facts or evidence in response to Defendant's challenge to her prima facie case regarding

19   the EEOC complaint means that summary judgment is appropriate for Defendant as to any of

20   Plaintiff's FEHA claims that arise from the EEOC Complaint. *See, e.g.*, *Soremekum* at 984.

21          For several reasons, discussed below, Plaintiff's last-minute shift in her opposition to claim

22   FEHA retaliation based on the February 25 email also fails, and Defendant is entitled to summary

23   judgment as to Claim Two in its entirety.

24          Though an internal complaint suffices as protected activity under FEHA, *see, e.g.*, *Cozzi v.*

25   *County of Marin*, 787 F. Supp. 2d 1047, 1067 (N.D. Cal. 2011) ("Here, Pascale's protected

26   activity was her internal complaint of age discrimination."), the fact that Plaintiff identifies the

27   William Moore email as the basis for her protected activity claim *for the first time in her*

28   *opposition to the summary judgment motion* is fatal to her FEHA claim. In her FAC, Plaintiff

United States District Court
Northern District of California

identifies her protected activities under FEHA as "her complaints to the CHP[,] Department of Fair Employment and Housing ("DFEH")  and to the Equal Employment Opportunity Commission." FAC ¶ 39. There is no mention whatsoever in the FAC of the February 25, 2013 internal grievance email to William Moore. Defendant notes in reply that this is the first time Plaintiff has asserted this email complaint as a protected activity. *See* Reply at 13.

In this circuit, a plaintiff cannot seek to avoid summary judgment on a FEHA claim by asserting a protected activity for the first time in her opposition to the motion for summary judgment. This rule was articulated in *Pickern v. Pier 1 Imports (U.S.) Inc.*, where the plaintiff attempted to assert new violations of the Americans with Disabilities Act for the first time in her opposition to Defendant's motion for summary judgment. *See* 457 F.3d 963, 968 (9th Cir. 2006). The trial court held that this failed to provide the defendant with fair notice of the allegations which purportedly gave rise to liability. *Id.* ("[T]he complaint gave the [defendant] no notice of the specific factual allegations presented for the first time in Pickern's opposition to summary judgment.") (citing the district court's order). Courts, including this one, have held that *Pickern* demands that a plaintiff's alleged protected activities arise from claims specifically pled in the complaint. *Leglu v. Cnty. of Santa Clara*, 2014 WL 4100599, at *6-7 (N.D. Cal. Aug. 20, 2014).

Plaintiff makes no reference in her FAC to *any* internal DOR complaints. Rather, she identifies three specific activities: (1) her silent instruct to Ms. Gualberto to call the CHP, which the Court found above was not protected activity under the First Amendment, (2) her DFEH complaint, and (3) her EEOC complaint. *See* FAC ¶ 39. Stating that her protected activities "include, but are not limited to" these three complaints does not allow Plaintiff in opposition to a motion for summary judgment to articulate a brand new theory of protected activity. *See, e.g.*, *Pickern* at 968. The Court finds that, by failing to include the Moore email as protected activity in her FAC, Plaintiff has failed to give fair notice to Defendant State of California as to the grounds upon which she now, in her opposition to the motion for summary judgment, asserts a claim under FEHA. Because this is the *only* protected activity Plaintiff alleges in response to Defendant's motion for summary judgment, she has failed to show that she engaged in protected activity. This is sufficient for the Court to grant summary judgment for Defendant as to Plaintiff's Claim Two.

United States District Court
Northern District of California

1    Even if the Court overlooked the lack of notice, however, Plaintiff would still fail to show

2    a prima facie case of retaliation because she has not shown that Ms. Sweeney engaged in an

3    adverse action in response to Plaintiff's email to Mr. Moore. Though courts in this circuit take "an

4    expansive view of the types of actions that can be considered adverse," *Ray v. Henderson*, 217

5    F.3d 1234, 1240 (9th Cir. 2000), an adverse employment action must "materially affect the terms,

6    conditions, or privileges of employment to be actionable." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.

7    4th 1028, 1043 (2005). Plaintiff contends that Ms. Sweeney "orchestrat[ed] an adverse action," in

8    response to the email to William Moore, which she defines as "a written adverse response,

9    accusing Mrs. Mitchell-Matthews of being insubordinate." Pl.'s Opp. at 23 (citing Bonner Decl.,

10   ECF 59-4 at 52 (email correspondence involving Ms. Sweeney and Plaintiff)).

11   Some context is necessary to understand these adverse action allegations. Plaintiff was

12   scheduled to meet with Ms. Hezel on March 19, 2013, and requested that a note-taker be present at

13   the meeting. When Plaintiff was informed that Ms. Labit would be that note-taker, she objected

14   because Ms. Labit was "management." Following a series of emails back and forth, Ms. Sweeney

15   sent an email which accused Plaintiff of being insubordinate. Plaintiff contends that "[f]rom the

16   tone of the email it is clear that Sweeney has animus for Mrs. Mitchell-Matthews and uses Mrs.

17   Mitchell-Matthews reasonable accommodation request as a justification for discipline." Pl.'s Opp.

18   at 23.  A review of the evidence shows that Plaintiff was offered Ms. Labit's services as a note-

19   taker at the meeting in question, but ultimately decided to take notes herself instead of permitting

20   Ms. Labit to do so. Bonner Decl., ECF 59-4 at 52; *see also id.* at 50 ("You decided to take your

21   own notes at the meeting."). The denial of Plaintiff's ability to choose her own note-taker for a

22   meeting is not an adverse action under FEHA.[6] Nor is a single email in which Ms. Sweeney

23   accuses Plaintiff of being insubordinate. *See, e.g.*, *Norwood v. Leland Stanford Junior Univ.*, 2004

24

25   ─────────────

26   [6] To the extent that Plaintiff contends her request for reasonable accommodation is itself the
     protected activity under FEHA, the California Court of Appeal has foreclosed this argument. In
     *Rope v. Auto-Chlor Sys. of Wash., Inc.*, 220 Cal. App. 4th 635 (2013), the Court of Appeal
27   expressly held that there was "no support in the regulations or case law for the proposition that a
     mere request—or even repeated requests—for an accommodation, without more, constitutes a
     protected activity sufficient to support a claim for retaliation in violation of FEHA." *Id.* at 652
28   (analyzing Government Code Section 12940(h)).

United States District Court
Northern District of California

1   WL 2203553, at *6-7 (N.D. Cal. Sept. 29, 2004) (granting summary judgment for lack of FEHA

2   violation when plaintiff was repeatedly "warned that if his insubordinate behavior did not stop, he

3   would be subject to discipline"). Plaintiff cites to no evidence in the record to show that this

4   "insubordinate" comment materially affected the terms or conditions of her employment.

5        Defendant State of California is therefore entitled to summary judgment on Plaintiff's

6   second cause of action for two reasons. First, Plaintiff did not provide Defendant with fair notice

7   in her FAC of the protected activity she would for the first time articulate in her opposition to the

8   motion for summary judgment. *See Pickern* at 968. Second, even considering the merits of

9   Plaintiff's argument, the undisputed facts do not show show that she suffered any adverse action

10  that materially affected the terms or conditions of her employment in response to her email to Mr.

11  Moore. The Court therefore GRANTS Defendant's motion for summary judgment on Claim Two.

12      **C.    Claim Three: Disability Discrimination (Against Defendant State of**

13          **California)**

14       Defendant State of California seeks summary judgment as to Plaintiff's Claim Three for

15  discrimination and disparate treatment in violation of Title VII and FEHA, and failure to prevent

16  discrimination or disparate treatment in further violation of Title VII and FEHA. Plaintiff's FAC

17  alleges that she was subjected to disparate treatment based on her medical condition. *See* FAC ¶

18  44. Defendant argues first that medical discrimination is not a protected classification under Title

19  VII, and second that Plaintiff has not made out a prima facie case of medical condition

20  discrimination under FEHA. *See* Mot. at 24. The Court considers each argument in turn.

21       First and foremost, Defendant is correct that Title VII, which bars discrimination on the

22  basis of "race, color, religion, sex, or national origin," does not contemplate discrimination claims

23  based on a plaintiff's medical condition, except inasmuch as the medical condition relates to sex

24  discrimination. *See* 42 U.S.C. 2000e(k) ("The terms 'because of sex' or 'on the basis of sex'

25  include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related

26  medical conditions."). Plaintiff's medical condition claim involves an orthopedic condition, and

27  she has articulated no reason why her condition would be covered under §2000e(k). She thus

28  cannot prove a claim for medical condition discrimination under Title VII.

1    Second, for purposes of medical condition discrimination under FEHA, a Plaintiff must

2    show four things: that she (1) was a member of a protected class, (2) was qualified for the position

3    held, (3) suffered an adverse employment action, and (4) "some other circumstance [that] suggests

4    discriminatory motive." *Guz v. Bechtel*, 24 Cal. 4th 317, 355 (2000). Consistent with its moving

5    burden to "show that the nonmoving party does not have enough evidence of an element to carry

6    its ultimate burden of persuasion at trial," *Nissan Fire*, 210 F.3d 1099, 1102, Defendant argues

7    that Plaintiff has not produced any evidence suggesting that she was discriminated against based

8    on her medical condition, and thus cannot make out a prima facie case under *Guz*.

9    Plaintiff once again wholly ignores Defendant's arguments, and in opposition contends

10   *only* that she was subjected to disparate treatment due to her race. *See* Pl.'s Opp. at 24 ("In this

11   case, there is a triable issue of fact regarding whether race played a factor in the decision to

12   discipline Mrs. Mitchell-Matthews after the CHP incident."). The Court does not consider any

13   argument made by Plaintiff with regard to racial discrimination because she did not give

14   Defendant State of California fair notice of a racial discrimination claim in her FAC – it in fact

15   does not reference Plaintiff's race whatsoever. *See* FAC, ECF 24; *see also Pickern* at 968.

16    With regard to Plaintiff's medical condition discrimination claim, she cites to no evidence

17   in her opposition to support her claim of discrimination. *See* Pl.'s Opp. at 24-25. Plaintiff's failure

18   to produce evidence in response to Defendant's substantive arguments is a concession of those

19   arguments on the merits, because the Court need not comb through the evidentiary record in order

20   to piece together a claim on Plaintiff's behalf. *See, e.g.*, *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th

21   Cir. 1996) ("It is not [the task] of the district court [] to scour the record in search of a genuine

22   issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the

23   evidence that precludes summary judgment.").

24    Because Plaintiff fails to substantively respond to Defendant's argument regarding medical

25   condition discrimination, she has not produced evidence that "suggests a discriminatory motive"

26   regarding DOR's actions toward her based on her medical condition. *See Guz* at 355; *see also*

27   *Keenan* at 1279. As the Court noted above with regard to Plaintiff's second claim for retaliation

28   under FEHA, Plaintiff has not articulated an adverse action that materially affected the terms or

United States District Court
Northern District of California

1 | conditions or her employment, because neither Ms. Sweeney's email nor the denial of Plaintiff's

2 | preferred note-taker (when a note-taker was otherwise offered to Plaintiff for the meeting in

3 | question) constitutes an adverse action under FEHA.

4 | Plaintiff cannot shift her disability discrimination claim into one for racial discrimination

5 | in her opposition to the motion for summary judgment, when no racial discrimination claim was

6 | pled in the FAC. Plaintiff also fails in her opposition to produce evidence to show a prima facie

7 | claim for disability discrimination. Even giving Plaintiff the benefit of all doubts and imputing her

8 | claimed adverse actions from her FEHA retaliation claim into her disability discrimination claim

9 | does not save the claim, as neither of the actions alleged is adverse for purposes of FEHA.

10 | Because Plaintiff has not made out a prima facie case for discrimination under Title VII or

11 | FEHA, her claim for failure to prevent discrimination also fails as a matter of law. *See Trujillo v.*

12 | *N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998) ("There is no logic that says a [plaintiff]

13 | who has not be discriminated against can sue an employer for not preventing discrimination that

14 | didn't happen, for not having a policy to prevent discrimination when no discrimination

15 | occurred."). The Court therefore GRANTS Defendant's motion for summary judgment as to

16 | Plaintiff's Claim Three.

### IV.   ORDER

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment in its entirety, and DENIES Plaintiff's Cross-Motion on Claim One.

Dated: April 1, 2015

BETH LABSON FREEMAN
United States District Judge

*United States District Court*
*Northern District of California*

23